**Mary Kay BARTELSON, on behalf of herself and on behalf of all other persons similarly situated**

v.

**DEAN WITTER & CO.**

**Civ. A. No. 78–839.**

United States District Court, E. D. Pennsylvania.

March 20, 1980.

---

**13.** Litton argues (Reply Memorandum filed April 16, 1980, at 2), that it has "no way short of making a complete total physical review of all documents produced in the New York case to determine which ones are confidential," and that this imposes a great burden upon it. But this Court has previously held that "[a]ny bur-

den to Litton arises solely from the fact it refuses to shortcut the subpoena route by declining to give its permission to AT&T to use the microfilm it already has, and it is thus entirely self-inflicted." February 13, 1980 Order, at p. 4.

**660**

Howard A. Specter, Litman, Litman, Harris & Specter, P. A., Pittsburgh, Pa., Arnold Levin, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for plaintiff.

James P. Garland, Semmes, Bowen & Semmes, Baltimore, Md., Jay H. Calvert, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is an employment discrimination case brought under 42 U.S.C. § 2000e *et seq.* in which we are called upon to make a class action determination. The case raises interesting questions about the import of the typicality requirement of Fed.R.Civ.P. 23(a)(3), specifically whether a white female can represent a class that includes minority groups and whether, having been an employee of defendant, she can represent persons who were never hired.

Plaintiff, Mary Kay Bartelson, is a white female who was hired as an account execu-

tive by the brokerage firm of Dean Witter & Co., Inc. (Dean Witter),[1] on September 22, 1976. On November 22, 1976, she was fired, allegedly because she had failed to make any sales or generate any new accounts during her two month tenure as a Dean Witter employee. On December 10, 1976, she filed a charge with the Equal Employment Opportunity Commission claiming she had been the victim of sex discrimination in that she had been "harassed" by her superiors and held to a higher standard of performance than similarly situated male coworkers. On January 7, 1977, she filed an amended charge complaining of the broader discriminatory policies she seeks to litigate here.[2] On September 29, 1977, the EEOC issued a right to sue letter, and this action was commenced in December of that year.

Plaintiff has moved for certification of a nationwide class made up of:

all past and future female, black, Spanish surnamed Americans and other minority employees and job applicants of Dean Witter and all such persons who were employed by or applied for employment with the defendant at any time on or after a day 300 days before Dean Witter was first charged with employment discrimination by a class member who filed a charge of discrimination with the Equal Employment Opportunity Commission.

Defendant objects to the certification of any class, arguing that Ms. Bartelson's complaint is an individualized one, arising from circumstances unique to her. Moreover, relying on *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), and certain of its progeny, defendant argues that the liberal standards that have traditionally been applied to class certification questions in

---

1. Dean Witter & Co., Inc. merged with Reynolds Securities, Inc. on January 3, 1978, to become Dean Witter Reynolds, Inc.

2. The amended charge reads: The employer on a nationwide basis uniformly and systematically discriminates against females and minorities as a class, including the charging party, in hiring, promotion, training, discharge, classifi-

cation, layoffs, compensation, benefits, terms and conditions of employment. This is a class action brought on behalf of the charging party and others similarly situated, to-wit, all past, present and future female and minority applicants and employees discriminated against by the employer in the United States.

employment discrimination suits (popularly termed the "across the board" approach) are no longer permissible and that under the "new" caselaw plaintiff cannot be found to have satisfied the numerosity, commonality, typicality, or adequacy of representation requirements of Rule 23(a). Defendant also argues that, as to the class allegations of her complaint, plaintiff, by her counsel, has not complied with Fed.R. Civ.P. 11 ("The signature of an attorney [on a pleading] constitutes a certificate by him that . . . to the best of his knowledge, information, and belief there is good ground to support it . . .") or demonstrated her financial ability to maintain the lawsuit she purports to bring. These lapses, coupled with "inherent" conflicts between plaintiff and certain putative class members are said to be further evidence of her inadequacy as a representative under Rule 23(a)(4).

Plaintiff rejoins that, despite certain *Rodriguez*-bottomed case law that might appear to restrict the availability of the class action device in employment discrimination suits, the across the board approach remains a viable one and that under this approach plaintiff has met the Rule 23 requirements. Plaintiff urges us to reject those cases that have certified narrow classes—or refused certification altogether—on grounds of "inherent" conflict. She states that defendant's Rule 11 argument is improperly raised and is in any event without merit. Finally, plaintiff argues that because counsel has agreed to advance the costs of the lawsuit subject to her ultimate liability for reimbursement, her financial circumstances are irrelevant to our determination of the propriety of class treatment.

While for the reasons discussed below we find ourselves in agreement with the defendant that plaintiff has not satisfied all of the Rule 23 requirements as to the broad class defined in her complaint, we nonetheless find that she would be a proper representative of a somewhat narrower class. ▉ We have not found this case to present great difficulty in terms of the numerosity, commonality, and adequacy of

representation requirements and are satisfied that plaintiff has met those prerequisites. We agree with plaintiff that in analyzing whether she would be an adequate representative, the question of her financial status and the meritless Rule 11 allegations should play no part. Similarly, we do not believe that hypothetical conflicts, which have no basis whatsoever in the record, should influence our consideration of plaintiff's adequacy as a representative. The requirement that the claims of the named plaintiff be typical of the claims of the class members has, however, given us pause. As we explain below, a consensus seems to be emerging in the case law that accords the typicality requirement an independent vitality and a sense of linguistic or semantic integrity (vis á vis common usage). It defines typicality by notions of similarity and holds that typicality is not present when the representative plaintiff's circumstances and/or legal theory differ markedly from those of the other class members. Against this background it appears to us self-evident that plaintiff's claim to have been the victim of sex discrimination cannot be termed typical of claims of discrimination on account of race or national origin that would be raised by minority class members. Accordingly, we have excluded from the class those who would complain of discrimination that is not gender based.

▉ Despite defendant's contentions, however, we do not believe that *Rodriguez* signalled an end to across the board employment discrimination cases, though the recent interpretation of *Rodriguez* in *Scott v. University of Delaware*, 601 F.2d 76 (3d Cir. 1979), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979), has led to some disagreement among courts in this district about the scope of the Supreme Court's decision, particularly in cases where an employee or former employee seeks to represent a class including persons who were never hired. We have concluded that neither *Rodriguez* nor *Scott* absolutely bars such representation and that in the absence of an admission that he or she suffered from no manifestation of discrimination in

hiring, an employee or former employee may properly represent a class that includes disappointed job seekers.

■ The class we have defined will therefore consist of all present and future female employees and job applicants who were employed by or applied for work with Dean Witter Reynolds on or after a date 300 days before December 10, 1976, excluding those female employees and applicants, who, for reasons other than discriminatory policies based on sex, neither held nor sought to hold positions in the job categories of officials and managers, professionals, or sales workers.[3]

We turn now to a discussion of the impact of *Rodriguez* on the across the board approach in employment discrimination actions and to an examination of each of the Rule 23(a) requirements in light of the record before us.

### II. *The Impact of Rodriguez on Title VII Class Actions*

■ In a Title VII class action, the plaintiff has the burden of showing that the prerequisites of Fed.R.Civ.P. 23(a) and (b) have been met.[4] Rule 23(a) provides that one or more members of a class may sue or be sued as representatives on behalf of all parties similarly situated if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In *Scott, supra,* 601 F.2d at 84–85,

the court noted that the subdivision (a) prerequisites to class certification perform two functions: the requirements of common questions of law or fact and the impracticability of joinder establish a threshold standard as to the appropriateness of class treatment, while the requirements of commonality, typicality, and adequacy of representation insure that the interests of unnamed class members will be protected and furthered. In addition to being required by Rule 23, adequacy of representation is constitutionally mandated if absent class members are to be bound by the judgment. *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

■ Plaintiff's broad based attack on the employment practices of Dean Witter presents a classic example of the across the board approach to Title VII suits, so termed because they allege a single or unified underlying policy or pattern of discrimination attributable to the defendant-employer and seek to rectify the various forms in which the discrimination is manifested. In such cases the named plaintiff is permitted to represent all who are affected by the company-wide policy and not just those who suffer from the peculiar factual grievance suffered by the plaintiff. The across the board approach enables the court "to scrutinize not merely individual acts of discrimination but the panorama of unlawful employment policies that may underlie the individual incidents." 4 *Newberg on Class Actions* § 7973(a) at 1268. While most courts have approved such suits and have held that the requirements of Rule 23 should be applied liberally "in order to vin-

---

**3.** Although the complaint is framed as a broad-based attack on all the employment policies and practices of Dean Witter, at oral argument on the motion for class certification, plaintiff conceded that the lawsuit truly concerns only defendant's hiring, training, and promotion policies, which allegedly result in the employment of few females, which lock females into low level, low salary positions, and which require a higher standard of performance from the few females who find themselves in the better paying, upper level positions. Accordingly, we have excluded from the class females who are employed in low level positions or who were

refused employment for reasons unrelated to sex.

**4.** Defendant has not sought to challenge plaintiff's claim that this lawsuit falls within subdivision (2) of Rule 23(b), *i. e.* is a case in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final *injunctive relief or corresponding declaratory relief* with respect to the class as a whole." We agree that the suit is properly maintainable under that subsection and accordingly devote this opinion to a discussion of the Rule 23(a) requirements only.

dicate the important public policy of equal employment opportunity advanced by Title VII," *Hannigan v. Aydin Corp.*, 76 F.R.D. 502, 507 (E.D.Pa.1977), as we have noted above, the Supreme Court's decision in *Rodriguez* raised some question about the continued vitality of the across the board approach.

In *Rodriguez* three Mexican-Americans brought suit challenging several allegedly discriminatory practices of their employer, East Texas Motor Freight System, Inc., and certain unions in the trucking industry. They contended that East Texas refused to hire blacks and Mexican-Americans for "line driver" positions, limiting them to "city driver" positions, and complained that a transfer policy, which required a city driver to forfeit all seniority in order to be eligible for a line driver position, exacerbated the discriminatory hiring system. In addition to other relief, they demanded that the company merge its line driver and city driver seniority lists.

Although the complaint was brought on behalf of "all blacks and Mexican-Americans who had been denied equal employment opportunity with the defendant because of their race or national origin," plaintiffs did not move for class certification before trial and confined their proof to their individual claims. Following trial, the district court dismissed the class action allegations, stressing plaintiffs' failure to promptly move for class certification, their failure to offer evidence on that question, their concentration on their individual claims at trial, their stipulation that the only trial issue was the defendant's failure to act on their line driver applications, and the fact that the very relief they sought— merger of the seniority lists—had been overwhelmingly rejected by the union membership. The district court also found against the plaintiffs on their individual claims on the ground that they lacked the qualifications to be line drivers. The Fifth Circuit reversed, certified a class consisting of all "Negro and Mexican-American city drivers covered by the applicable collective bargaining contracts," and went on to find classwide liability on the basis of the individual proof adduced at trial.

The Supreme Court in turn reversed the court of appeals, holding that court had erred in certifying the class, since by the time the case reached the appellate stage it was clear that the named plaintiffs were not proper class representatives under Rule 23(a). Because the district court had found upon "abundant evidence" that the plaintiffs lacked the qualifications to be line drivers and since each named plaintiff had stipulated that he had not been discriminated against with respect to his initial hire, it was clear that plaintiffs were not members of the class of persons they sought to represent—all blacks and Mexican-Americans who had been denied equal employment opportunity because of their race or national origin. The court further found that plaintiffs' failure to seek class certification prior to trial and the fact that the remedy they sought was antithetical to the expressed desires of the putative class members rendered them inadequate class representatives.

Some courts have interpreted *Rodriguez* as a repudiation of the across the board approach to employment discrimination cases, *see e. g., Hill v. Western Electric Co., Inc.*, 596 F.2d 99 (4th Cir. 1979), and *Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631 (D.Md.1978). These courts have essentially read the Supreme Court's statement that a would-be class representative must "be a member of the class" and "possess the same interest and suffer the same injury" to require that the grievance suffered by the named plaintiff be factually indistinguishable from that suffered by the other class members lest there be a failure of the typicality and/or adequacy of representation requirements. We think it evident, however, that the Court did not intend to so emasculate the class action device in Title VII suits. Rather, both the language of *Rodriguez* and the cases cited therein indicate that the Court's primary concern was with the named plaintiffs' lack of standing, *i. e.*, by the time the class was certified it had been established that the representatives had suffered no injury whatsoever on

account of discrimination. We do not read the Court's reminder that careful attention to the requirements of Rule 23 is indispensable in employment discrimination suits as signalling an end to across the board actions.

This view accords with that expressed by a majority of courts that have considered the scope of *Rodriguez*. *See e. g. Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir. 1978) (en banc);[5] *Wajda v. Penn Mutual Insurance Co.*, 80 F.R.D. 303 (E.D. Pa.1978) (Luongo, J.); *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55 (E.D.Pa. 1977) (Newcomer, J.); *Gramby v. Westinghouse Electric Corp.*, 84 F.R.D. 655 (E.D.Pa. 1979) (Green, J.); *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460 (N.D.Cal.1978); *Arnett v. American National Red Cross*, 78 F.R.D. 73 (D.D.C.1978); *Vuyanich v. Republic National Bank of Dallas*, 78 F.R.D. 352 (N.D.Tex.1978); *Beasley v. Griffin*, 81 F.R.D. 114 (D.Mass.1979).

Our reading of *Rodriguez* finds support as well in *Scott v. University of Delaware*, 601 F.2d 76 (3d Cir. 1979), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979), where the court wrote:

Recently, in *East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977), the Supreme Court stated that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as class members." Standing alone, this language might suggest that class certification is always inappropriate when there are divergent interests between the named representative and absent class members. However, when read in context, it is evident that the Court did not intend to speak quite so broadly. The cases cited in support of the Court's statement did not concern the interpretation of Rule 23, but rather concerned the standing of the named representative to bring the suit.

If the named representative has suffered no injury in fact relative to the class claims, the named representative may lack standing because of the Article III case or controversy requirement. *But cf. Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (standing requirement satisfied by injury to entire class). Moreover, the Court in *East Texas Motor Freight* went on to suggest that there was an actual conflict of interests between the plaintiffs and the class they were certified as having represented. *See* 431 U.S. at 405, 97 S.Ct. 1891 [at 1897]. Finally, the procedural posture of *East Texas Motor Freight* was *sui generis* since the court of appeals had certified the class after the district court had made findings indicating that the plaintiffs were not proper class representatives.

Based on these factors, we agree that "[t]he conflict between the permissive and the rigorous approaches to the Rule 23(a) prerequisites was not settled by the Supreme Court's treatment of 23(a) in *Rodriguez*." Note, Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2), 88 Yale L.J. 868, 882 (1979). *See generally* Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 Harv.L.Rev. 664 (1979).

*Id.* at 85 n. 19. *See also* concurring opinion of Judge Adams at 93. ("As the majority observes in footnote 19 of its opinion, we fail to detect a disapprobation of [the across the board] approach in [*Rodriguez*].")

Although certain other statements in *Scott* render less than clear what the court believes the exact scope of *Rodriguez* to be, *see* discussion *infra* at 670–673, we believe the language cited above, coupled with Judge Adams' discussion of the thrust of the majority opinion, supports our conclusion that across the board suits remain an

---

**5.** Although the Fifth Circuit did not view *Rodriguez* as having been based on the plaintiffs' lack of standing, the court did observe that *Rodriguez* did not run "contrary to the policy favoring 'across the board' Title VII actions. It is not necessary that the representative suffer discrimination in the same way as other class members, but it is necessary that she suffer from the discrimination in some respect." *Id.*

appropriate means of raising employment discrimination claims.

With the foregoing in mind, we now consider whether plaintiff has alleged sufficient injury to confer standing and whether she has met the requirements of Rule 23(a).

### III. *Standing*

■ Rule 23 provides by its terms that *"[o]ne or more members of a class* may sue or be sued as representative parties on behalf of all . . ." so long as the four prerequisites—numerosity, commonality, typicality, and adequacy of representation—of Rule 23(a) are met. The requirement of class membership set forth in the preamble to Rule 23(a) and underscored above is merely the requirement that the named plaintiff(s) have standing to litigate the issues in the lawsuit. 4 *Newberg on Class Actions* § 7973(d); *see East Texas Motor Freight System Inc. v. Rodriguez, supra,* 431 U.S. at 403, 97 S.Ct. at 1896 and discussion *supra* at 663.

It is clear that since plaintiff has alleged injury resulting from sex discrimination she may be viewed as a member of the class of persons injured by sexually discriminatory policies and thus has standing to sue both in her own right and on behalf of the class. In terms of the various minority groups she seeks to represent, however, it appears at first glance that Ms. Bartelson's "interest and injury" are not coextensive with the interests and injuries of those groups and that her attempt to sue on their behalf must fail for want of standing. Yet in her complaint Ms. Bartelson alleges, *inter alia,* that working in an environment laden with racial discrimination injured her by depriving her of the benefits of interracial associations.

■ In *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 209–10, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972), the Supreme Court permitted a white tenant to sue his landlord for discrimination against blacks, holding that the term "person aggrieved"

as used in § 810 of Title VIII of the 1968 Civil Rights Act, 42 U.S.C. § 3610(a), was broad enough to include "persons [who are injured by] the loss of important benefits from interracial associations." In so concluding, the Court analogized the case to and drew upon the reasoning of *Hackett v. McGuire Bros. Inc.,* 445 F.2d 442 (3d Cir. 1971), which construed the term "person aggrieved" as used in Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–5, as manifesting a "congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Id.* at 446. Thus it would seem that the view of standing expressed in *Trafficante* would apply equally in cases brought under Title VII, although neither the Supreme Court nor the Third Circuit has specifically addressed the question.[6]

■ In *Waters v. Heublein, Inc.,* 547 F.2d 466 (9th Cir. 1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977), the Ninth Circuit held that a white female had standing to sue under Title VII to enjoin discriminatory employment practices directed at blacks and Hispanics as well as at women. In determining that plaintiff was a person aggrieved by racial discrimination, the court found the case "logically indistinguishable from *Trafficante,*" noting that the benefits to be gained from interracial associations are at least as great in the workplace as they are at home. *Accord, Equal Employment Opportunity Commission v. Bailey,* 563 F.2d 439 (6th Cir. 1977), *cert. denied,* 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978). *See also* 4 *Newberg on Class Actions* § 7973(a).

■ Thus, we think that Ms. Bartelson has alleged sufficient injury to confer standing to bring suit on behalf of persons complaining of racial discrimination. Whether or not these allegations also satisfy the four requirements enumerated in Rule 23(a) is a different question, however, and one to which we now turn.

---

**6.** We do not believe *Rodriguez* has any ramifications in this regard since by the time that case was certified as a class action, it was clear

that the representative plaintiffs had suffered no injury.

## IV.  Rule 23(a) Requirements

### A.  Common Questions of Law or Fact

█ Rule 23(a)(2) requires that there be questions of law or fact common to the class, although not all questions of law or fact raised need be in common.  7 Wright and Miller, *Federal Practice and Procedure*, § 1763 at 607.  Some courts have held that where plaintiff has launched an across the board attack on a defendant's employment practices, the commonality requirement is automatically met—the common question provided by the allegation of discrimination. *See, e. g., Presseisen v. Swarthmore College*, 71 F.R.D. 34 (E.D.Pa.1976); *Parker v. Bell Helicopter Co.*, 78 F.R.D. 507 (N.D.Texas 1978).  While this approach eases the task of the court considering certification, it seems to us to be overly facile and conclusory, particularly in light of the Supreme Court's admonition in *Rodriguez* that although employment discrimination cases are often by their very nature class suits, careful attention to the prerequisites of Rule 23 is "nonetheless indispensable."  We think it clear, however, both in terms of the congressional policy underlying Title VII and because to hold otherwise would be to read the class action device out of existence, that the class members need not be virtually interchangeable.  *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55 (E.D.Pa. 1977); *Black Grievance Committee v. Philadelphia Electric Co.*, 79 F.R.D. 98 (E.D.Pa. 1978).  Instead, we believe the proper focus of the commonality analysis lies somewhere between the two extremes.

In *Kuhn v. Philadelphia Electric Co.*, 80 F.R.D. 681 (E.D.Pa.1978), Judge Huyett wrote that where allegations of across the board discrimination in hiring, promotion, salary, and other terms and conditions of employment are coupled with a showing of centralized control over such decisions, plaintiff has satisfied the burden of showing common questions of law or fact.  Similarly, in *Black Grievance Committee v. Philadelphia Electric Company, supra*, 79 F.R.D. 98, Judge Bechtle held that the commonality requirement is satisfied where the alleged unlawful discrimination is a company-wide pattern or practice, even though specific examples of discrimination manifested within the class may differ.  *See also Hannigan v. Aydin Corp., supra*, 76 F.R.D. at 507 (the focus of the common question inquiry is "whether the alleged unlawful discrimination is individually practiced against employees or is a company-wide policy").

In *Karan v. Nabisco Inc.*, 78 F.R.D. 388 (W.D.Pa.1978), Judge Snyder observed that plaintiff's burden to show commonality is more difficult where the members of the purported class work at various locations throughout the country or where the specific terms, conditions, and practices of employment are not uniform.  Plaintiffs can nevertheless infer that the discrimination they suffer is a system-wide policy (and thus common questions can be found) if there is evidence that "although local terms and practices vary, they are imposed or supervised by a central administration, that central administration knew of the discriminatory practices and permitted them to continue, that statistical evidence show[s] a consistent pattern throughout the system, or that class members at the other locations have made similar charges.  Thus, some evidence of any of these could sustain Plaintiffs' threshold burden of showing commonality."  *Id.* at 404.

We note that since at the certification stage the court is not to examine the merits of the case, *i. e.*, to attempt to determine whether a company-wide policy of discrimination in fact exists, our inquiry must be limited to deciding whether plaintiff has set forth facts sufficient to support the *allegation* of company-wide discrimination.  *Hannigan, supra*, 76 F.R.D. at 508.

█ Applying this approach to the case before us, we believe that plaintiff has introduced enough facts to support her allegation that a corporate policy of sex and racial discrimination, emanating from a central administration, exists on the part of the defendant, and thus that there are questions of law or fact common to the class.

First, plaintiff has produced statistical evidence revealing that defendant's work force throughout the nation is predominantly made up of white males and that the females (and minorities) who are employed are by and large working in the lower level, lower salary positions.[7] These statistics support the allegations of the complaint that females (and minorities) are discriminated against with respect to hiring, placement, and promotion and indicate a pattern of discrimination that is company-wide rather than individually practiced. The class members whose skills have allegedly been underutilized (or not utilized at all) have grievances sufficiently similar to warrant class treatment. Second, although Dean Witter is a geographically diverse corporation with 220 branch offices located throughout the United States, plaintiff has produced facts—primarily through the deposition testimony of one Eli Salig, an assistant vice-president of personnel at Dean Witter—indicating that defendant's employment policies are both developed and overseen by a central administration. The local variations on these corporate policies are few and relatively insignificant. For example, wage and salary schedules are developed at the national level and the discretion of local offices to fix compensation is limited to offering wages and increases within strictly defined ranges. Commission rates for account executives and other sales personnel are uniform throughout the company, as are the criteria for hiring account executives. The duties of sales personnel do not vary from branch to branch, and all account executives trainees undergo the same training program. A nationally distributed manual prepared by the National Personnel Manager governs personnel policies and practices at every branch office in the country. Dean Witter submits a single Equal Employment Opportunity Employer Information (EEO–1) Report that supplies data from all its facilities.

These and similar facts support plaintiff's allegation of a company-wide policy of discrimination and, when viewed along with the statistical data garnered from the EEO–1 Reports, are sufficient to sustain her burden to show commonality.

### B. *Typicality*

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. The meaning of this requirement has historically been somewhat elusive. Professor Moore has concluded that there is no need for this subsection at all, "since all meanings attributable to it duplicate requirements prescribed by other provisions in Rule 23." 3B Moore's Federal Practice ¶ 23.06–2 at 23–325. Some courts have equated typicality with commonality, while others have held that it is more akin to the Rule 23(a)(4) requirement that the representative party adequately protect the interests of the class. 4 *Newberg on Class Actions* § 7983. *See* 7 Wright and Miller, *Federal Practice and Procedures* § 1764 and cases cited therein.

■ Still other courts and commentators have attempted, quite correctly we think, to ascribe an independent meaning to Rule 23(a)(3) and have posited various tests by which the court may determine whether the prerequisite has been met. A widely utilized formulation has been that advanced in 7 Wright and Miller, *supra*, § 1763 at 614: [8]

. . . Plaintiff has satisfied Rule 23(a)(3) if the claims or defenses of the

---

7. For example, in the years 1974, 1975, and 1976 females made up 30% of Dean Witter's work force, but they accounted for only 3% in 1974, 8% in 1975, and 10% in 1976 of the officials and managers; 27%, 19% and 20% of the professionals; and 2%, 4% and 3% of the sales workers. In contrast, in the same years, they comprised 64%, 66% and 66% of the office and clerical staff.

8. *See e. g. Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181 (10th Cir. 1975); *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460 (N.D.Cal.1978); *Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir.) *cert. denied*, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Fertig v. Blue Cross of Iowa*, 68 F.R.D. 53 (N.D.Iowa 1974); *Pendleton v. Schlesinger*, 73 F.R.D. 506 (D.D.C.1977); *Karan v. Nabisco, Inc.*, 78 F.R.D. 388 (W.D.Pa. 1978).

representatives and the members of the class stem from a single event or are based on the same legal or remedial theory. Of course, when this is true the standard under subdivision (a)(3) is closely related to the common question prerequisite in subdivision (a)(2). On the other hand, Rule 23(a)(3) may have independent significance if it is used to screen out class actions where the legal or factual position of the representatives is markedly different from that of the class even though common questions of law or fact are raised.

This approach focuses on the legal and/or factual stance assumed by the class representative as compared with that of the class members. Under this approach, while factual variations will not defeat certification where the various claims arise from the same legal theory, where the named plaintiff's individual circumstances are markedly different or where the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based, there exists the danger that the unique circumstances or legal theory will receive inordinate emphasis and that the other claims will not be pressed with equal vigor or will go unrepresented. *Karan v. Nabisco, Inc.*, 78 F.R.D. 388, 405 (W.D.Pa.1978); *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 691–92 (E.D. Pa.1977); *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 489 (N.D.Cal.1978). ("[M]ere anticipation that all class members will benefit from the suit . . . is not enough. But interests sufficiently parallel to ensure a vigorous and full presentation of all potential claims for relief should satisfy Rule 23(a)(3)"). *See Scott v. University of Delaware, supra*, 601 F.2d at 84.

Illustrative of this approach is *Donaldson v. Pillsbury Co., supra*, 554 F.2d 825 (8th Cir. 1977) (Webster, J.), in which the court described the typicality prerequisite variously as a requirement that there be other members of the class who have the *same or similar grievances, id.* at 830; that the charge be based on patterns or practices *not special or unique* to plaintiff, *id.* at 831; that a significant number of other members

of the class have been *similarly victimized by the same patterns or practices. Id.* The approach of *Donaldson* and of other courts adopting the Wright and Miller formulation thus appears to be an attempt to attribute semantic integrity to the term "typicality," by using what is essentially its common sense definition and positing that where the plaintiff's factual or legal stance is not characteristic of that of other class members, the typicality prerequisite has not been met.

In something of a variation of the above analysis, other courts have held that in order to satisfy the typicality requirement, plaintiff must show that the issues of law or fact he or she shares in common with the class occupy "the same degree of centrality" to his or her claims as to those of unnamed class members. *Cottrell v. Virginia Electric and Power Co.*, 62 F.R.D. 516 (E.D.Va.1974); *Parker v. Bell Helicopter Co.*, 78 F.R.D. 507 (N.D.Texas 1978); *see Wofford v. Safeway Stores, supra*, 78 F.R.D. at 489.

Addressing the typicality requirement in a Title VII context, in *Hannigan v. Aydin Corp., supra*, 76 F.R.D. at 508, Chief Judge Lord wrote that typicality exists where plaintiff has demonstrated some "nexus" with the claims of other class members, which can be shown by demonstrating the similarity between the conditions of employment of plaintiff and those of other class members, the similarity between the alleged discrimination practiced on the named plaintiff and that affecting the class, and by the compatibility of the relief requested and that appropriate for the class.

We view the "centrality" and "nexus" tests as functionally indistinguishable from the Wright-Miller/*Donaldson* "marked difference" formulation; each test attributes to the typicality requirement what we have termed a semantic integrity by focusing on its dictionary or common sense meaning. We see no point in attempting an additional formulation, for we could not improve on the foregoing. Moreover, we think that under any of these formulations plaintiff's

attempt to represent blacks and other minority groups must fail for lack of typicality. Plaintiff's *Trafficante* claim—that she has a right to work in an environment free from discrimination—is on its face markedly different from claims of persons who have been the victims of discrimination because of their own race or national origin. It would be illogical to hold that a claim by a white female based on a denial of the benefits of an integrated workplace arises from the same factual nexus or legal or remedial theory as the claim of one who has been denied a benefit because of his race or national origin or that such a claim is as central to this plaintiff's lawsuit as would be a claim of racial discrimination raised by a person against whom the discrimination was actually directed. We think that vis á vis the minority class members, Ms. Bartelson presents a classic example of the unique, *i. e.*, markedly different, plaintiff and thus that her claim is not typical of the minority class.

While we do not hold that because Ms. Bartelson is a white female, her interests are inherently antagonistic to those of minority males (*see* discussion *infra* of the requirement that a plaintiff be an adequate class representative), we nevertheless believe that were we to permit her to represent blacks and other minorities on the basis of her rather tangential and amorphous claim, there would be a very real possibility that the claims of the class members who had suffered the most because of any racially or ethnically discriminatory policies on the part of defendant would be asserted with less vigor than they deserve. We note that in all the cases cited by plaintiff, where a class included both females and minorities, the named representative(s) claimed to have been the direct victim(s) of the kinds of discrimination complained of. Thus, for example, in *Donaldson v. Pillsbury Co., supra,* 554 F.2d 825 (8th Cir. 1977), a black female was permitted to represent both blacks and females. In *Rich v. Martin Marietta Corp.,* 522 F.2d 333 (10th Cir. 1975), named plaintiffs included females, blacks, and Spanish-surnamed persons. In *Alaniz v. California Processors, Inc.,* 73

F.R.D. 269 (N.D.Cal.1976), a class composed of blacks, Asian Americans, Native Americans, Spanish-surnamed Americans, and females was represented by named plaintiffs that included females, Hispanics, and a Native American. In *Waters v. Heublein, Inc., supra,* 547 F.2d 466 (9th Cir. 1976), heavily relied on by plaintiff, the court specifically withheld judgment on whether the Rule 23(a) requirements had been met and limited its holding to a determination that a white female had *standing* to complain of racial discrimination. We have found no case in which a white female was permitted to represent both females and minorities. Indeed, some courts have refused to permit a single representative to complain of more than one kind of discrimination in a single action on the theory that such representation raises an inherent conflict of interest. *See, e. g., Droughn v. F.M.C. Corp.,* 74 F.R.D. 639 (E.D.Pa.1976) (black female could not represent both blacks and females); and *Black Grievance Committee v. Philadelphia Electric Co.,* 79 F.R.D. 98 (E.D. Pa.1977) (blacks could not represent both blacks and Hispanics).

As to plaintiff's claim of sex discrimination, defendant has attempted to characterize her grievance as so personal as to preclude a finding of typicality. In *Hannigan, supra,* 76 F.R.D. at 508, Chief Judge Lord observed that Title VII cases that have held a named plaintiff's claim too individualized to permit a class action "have involved either an unusual employment decision adversely affecting the plaintiff or a disciplinary action against plaintiff as a result of that individual's conduct." Defendant would have it that plaintiff's claim falls into the latter category—that Ms. Bartelson was fired because she failed to make any sales. The problem with this argument is that it attempts to turn this motion for class certification into a trial on the merits. Though plaintiff admits her failure to generate any receipts, she claims that white males with similarly unimpressive sales records were permitted to remain in defendant's employ and that she was fired not because of her lack of sales but because

defendant held her to a higher standard of performance. The crux of plaintiff's individual claim is this factual dispute, which it would be improper for us to resolve on a motion for class certification.

The case before us is unlike *Martin v. Easton Publishing Co.*, 73 F.R.D. 678 (E.D. Pa.1977), relied upon by defendant, where the plaintiff had no statistical evidence to support her claim that there existed a company-wide policy of sex discrimination and in fact had admitted that her grievance was unique. Here plaintiff has made no such admission and has come forward with statistical data and an analysis of the defendant's corporate structure that support her allegations of a nationwide policy of sex discrimination. Since her claim arises from the same legal and remedial theory as that of others who believe themselves to have been the victims of sex discrimination, we believe that plaintiff has met the typicality requirement as to a class of female employees and job applicants.

At this juncture, it is necessary to consider the ramifications of the Third Circuit's decision in *Scott v. University of Delaware, supra,* 601 F.2d 76 (and *a fortiori* of *Rodriguez*) on the question whether, since plaintiff was in fact hired by defendant, her claims can be said to be typical of the class of job applicants. Though *Scott* speaks largely in terms of the adequacy of representation requirement, certain parts of the opinion appear to focus on typicality, and this language has led at least one court to conclude that where a former employee seeks to represent persons who were never hired, questions of typicality are necessarily raised. *Helbling v. Unclaimed Salvage and Freight Co., Inc.,* No. 78–589 (E.D.Pa. September 27, 1979) (Broderick, J.).

In *Scott*, a former assistant professor at the University of Delaware brought suit alleging that the university discriminated against blacks in its hiring and promotional practices. The district court certified a class including applicants for faculty positions and current faculty members. Fol-

lowing trial the court found against Scott on both his individual and his class claims. On appeal the Third Circuit affirmed with respect to the individual claims but held that because the facts developed at trial had revealed that the Rule 23(a) prerequisites had not been met, the class should have been decertified.

In holding that the class should have been decertified, the court found the case to be one in which the interests of the named plaintiff clearly conflicted with those of the unnamed applicant class members.[9] As a faculty member whose contract was not renewed, Scott did not (and indeed could not in view of the fact that he received a premium upon appointment over the salary normally paid by the university) claim that he had been discriminated against by the university's hiring policies. He nonetheless sought to challenge those policies, including the requirement that applicants for faculty positions possess a doctoral degree. He thus attacked via the applicant class the very degree he possessed and which he asserted in his own favor in litigating his individual claim for promotion and tenure:

> The assertion of these inconsistent positions necessarily forecloses any contention that Scott's claims are typical of the claims of those applying for faculty positions. Under these circumstances, it cannot be said that Scott was an adequate representative of the unnamed members of a class seeking employment.

*Id.* at 86.

In holding that the claim of this former employee was not typical of the claims of prospective employees, the court relied in large part on *Rodriguez* and cases that have construed *Rodriguez* as precluding a plaintiff who challenges a defendant's discriminatory promotion practices from representing a class contesting the defendant's discriminatory hiring practices:[10] "[Like the plaintiff's in *Rodriguez*], Scott concedes that he personally suffered no discrimination when he was hired. Since he was not

---

9. As to the faculty class, the court found that the numerosity requirement had not been met.

10. *See id.* at 87 n. 23.

injured by any alleged discriminatory hiring practices, it is doubtful after [*Rodriguez*] that he can lead a class challenging the University's hiring practices." *Id.* at 87.

While the above statement might appear to support the view that under *Rodriguez* as interpreted in *Scott* a current or former employee might never represent a class that includes disappointed applicants, we do not believe the Third Circuit intended to paint with so broad a brush.

First we note that nowhere does the opinion state that the district court erred initially in certifying a class that included applicants. Rather the error lay in the court's failure to decertify the class once the inconsistencies in Scott's position became apparent. *See* concurring opinion of Judge Adams, *id.* at 92.

Second, though the holding is couched in the most general of terms, the court makes clear that its major concern was the apparent conflict between the position Scott sought to assert as an individual and that which he sought to assert as class representative. Furthermore, while the court terms Scott's claims atypical of the applicant class, the holding in fact rests on a finding that Scott could not be an adequate representative of that subclass. *Id.* at 86 and 88 n. 24. Because the court reaffirms the test for adequacy of representation set forth in *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir.), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), *id.* at 86 n. 21 (that the plaintiff's attorney be qualified, experienced, and generally able to conduct the proposed litigation and that the plaintiff have no interests antagonistic to those of the class),[11] it seems to us that the real reason for the court's determination that the class should have been decertified was the apparent conflict, and that no restriction on the liberal approach to Title VII class certification was intended.

Indeed, the court specifically distinguished *Scott* from *Wetzel*, in which former employees were permitted to challenge on behalf of past and present employees the defendant's *hiring* policies as well as its *promotion* policies, on the ground that in *Wetzel* the former employees, who had voluntarily left their jobs, would not be adversely affected by potential competition from prospective employees, while Scott, who sought reinstatement, would have been in sharp competition for contract renewal and tenure with applicants who might be offered faculty positions.

Thus, we do not read *Scott* as precluding an employee from representing applicants where there is no apparent conflict of interest. This view is in accord with that expressed by Judge Adams in his concurrence in *Scott* and is in keeping with the holding in *Wetzel*. Finally, we note that the case before us is distinguishable from *Scott* in two significant ways: First, unlike Scott, Ms. Bartelson does not seek reinstatement, so there is no potential competition between her and the prospective employees who might benefit from a ruling against the defendant. Second, Ms. Bartelson does not concede, as did Scott, that she suffered no injury on account of defendant's allegedly discriminatory hiring policies, and we do not think that the mere fact that she was employed by Dean Witter necessarily forecloses such a finding. For if, as plaintiff alleges, defendant has a policy of hiring few females for sales positions, then plaintiff, who was hired for a sales position, may have been injured by that policy to the extent that it caused her to be more closely supervised than male coworkers ("harassed") and led her superiors to demand or expect a higher level of performance from her than from similarly experienced males. Indeed, we think to the extent that the factual basis for a claim lends itself to placement under one of the headings commonly associated with Title VII actions, Ms. Bartelson's claim would properly fall under the category of "discrimination in hiring."

11. The quality of the legal representation Scott had received played no part on the decision of the court. *Id.* at 84 n. 17.

Notwithstanding our reading, *Scott* and its apparent tensions with *Wetzel* have been a source of difficulty for district judges in this circuit. We think that the problem is created in part (or at least is compounded) by the fact that *Scott*, like *Rodriguez*, was decided on a full record. Translating conclusions made in light of a full record into principles applicable at the pretrial certification stage can be troublesome.

Moreover, while none of the judges in this district who have considered *Scott*'s applicability in cases where an employee seeks to represent persons who were never hired have found an absolute bar to such representation, some of them have read *Scott* broadly—to place substantial obstacles in the way of an employee representing applicants. Thus in *Helbling v. Unclaimed Salvage and Freight Co., Inc.*, No. 78–539 (E.D.Pa. September 27, 1979), Judge Broderick refused certification where the plaintiff did not claim to have been the victim of discrimination in hiring: "Nor can [plaintiff] claim to represent others whom she alleges to be victims of discriminatory hiring practices, in the absence of some allegation of discrimination in hiring which bears a 'nexus' to her own promotional claim." Similarly, in *Molthan v. Temple University*, 83 F.R.D. 368 (E.D.Pa.1979), Judge Luongo excluded applicants from the class certified "[since] none of the three named plaintiffs [all employees of defendant] contends that she was injured in any way by Temple's hiring practices." In *Gramby v. Westinghouse Electric Corp.*, 84 F.R.D. 655 (D.Pa. 1979), Judge Green read *Scott* more narrowly and certified a class that included applicants: "We interpret *Scott* as leaving unimpaired the decisions in this judicial circuit which have permitted plaintiffs whose personal claims involved discrimination only in promotions, salary or working conditions, to lead a class which included unsuccessful applicants for employment." Judge Green added, however, that the *Gramby* plaintiffs ". . . do not concede . . . that discriminatory hiring practices did not contribute to their allegedly inferior job classifications."

■ It is important to underscore the differences in approach in *Helbling* and *Molthan* on the one hand and *Gramby* on the other. In the former cases, plaintiffs were not permitted to represent applicants because they had failed to *allege* that they had suffered any discrimination when they were hired, whereas in the latter, plaintiffs were permitted to represent applicants because they had not *conceded* (as had the plaintiffs in *Scott* and *Rodriguez*) that they had *not* suffered discrimination when they were hired. We do not gainsay the reasonableness of the argument that since a plaintiff seeking certification has the burden to show that the prerequisites of Rule 23 have been met, it is the employee-plaintiff's burden to allege facts that would support a finding that he or she had suffered some form of discrimination when hired if the class is to include job applicants. We are not sure, however, that a failure to *allege* discrimination in hiring is the same as the finding in *Scott* after a trial that the plaintiff was not harmed in the hiring process. To repeat, we believe that there is certain tension between *Scott* and *Wetzel*, which we trust will be resolved by the Third Circuit in due course. Buttressed by the court's emphasis on "concession" and by Judge Adams' concurrence,[12] however, we are unwilling to read *Scott* as eroding the across the board approach to the extent of precluding an employee from representing an applicant in the absence of a clear concession (prior to certification) of lack of injury. Put differently, we believe that in the absence of an admission by the plaintiff that he or she suffered no discrimination when hired, an employee or former employee may represent an applicant class and that no affirmative allegations with respect to the named plaintiff's hiring need be made.

---

12. "We do not hold that . . . in general a person allegedly discriminated against with respect to promotion may not represent a class including individuals who were aggrieved by the employer's hiring practices." 601 F.2d at 93.

In any event, we believe that *Scott* permits an employee or former employee to represent a class that includes disappointed applicants, where, as here, that employee has set forth facts that would support a finding that he or she suffered from some manifestation of discrimination that infected the hiring process. *See* page 671, *supra.* Should future decisions of the Third Circuit or the Supreme Court reveal that our reading of *Scott* or of *Rodriguez* is incorrect, we will take appropriate steps to narrow the class we now certify. For the present, we are satisfied that Ms. Bartelson has fulfilled the typicality requirement with respect to a nationwide class of female employees and applicants.

## C. *Adequacy of Representation*

In addition to its generalized argument that plaintiff's employment experience with Dean Witter was too unusual to permit her claims to be found typical of those of any other class member, defendant has argued at some length that Ms. Bartelson would be an inadequate class representative of several identifiable subgroups of class members identified in her complaint.

As noted supra at 28, in this circuit adequacy of representation is determined by the two-part standard set forth in *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir.), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The plaintiff's attorney must be qualified and able to conduct the litigation and there must be no antagonistic interests between plaintiff and the class.

Defendant does not assert that plaintiff's attorney is unqualified, inexperienced, or in any other way incapable of conducting this litigation. Indeed, plaintiff's counsel is one of the abler, more experienced and better known class action attorneys currently practicing and, but for one aspect of defendant's arguments, we would summarily conclude that the first prong of the *Wetzel* test has been satisfied. Defendant has argued, however, that this lawsuit cannot be maintained as a class action because plaintiff, by her counsel, has failed to comply with the requirements of Fed.R.Civ.P. 11, which provides in relevant part:

> The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action.

Defendant asserts that because Ms. Bartelson was unable at her deposition to cite specific instances of discrimination practiced by Dean Witter (other than those allegedly directed at her) and because she exhibited no personal knowledge of defendant's operations outside of the Philadelphia office, where she was employed, she—and by "necessary inference" her counsel—has failed to demonstrate a reasonable basis for the broad and serious class-wide charges of discrimination contained in her complaint. Thus, the argument goes, given the paucity of knowledge exhibited by Ms. Bartelson, her attorney could not have believed that there was good ground to support the pleading.

Plaintiff's counsel counters this argument in several ways. First, he points out that defendant has never moved to dismiss the complaint or to strike the class allegations as sham under Rule 11, nor sought further information by way of interrogatories or document requests. The full extent of whatever knowledge counsel may have possessed at the pleading stage has never been explored nor has the question been raised before us until now. Furthermore, by citing isolated passages from plaintiff's deposition testimony, defendant has both (1) ignored the fact that plaintiff is familiar with the statistical data gathered before the complaint was filed and (2) shifted the focus from plaintiff's attorney, who is the subject of the Rule 11 strictures, to plaintiff, who cannot commit a Rule 11 violation.

We agree with the observation of plaintiff's counsel that the "necessary inference" that he possessed no more information than plaintiff divulged at her deposition is a non sequitur, particularly in view of the attorney-client privilege.

In light of the undeveloped state of the record with regard to the Rule 11 issue, which appears to us to border on the frivolous, and the peculiar procedural posture in which it has been raised, we think this argument of defendant has no place in our consideration of whether to certify a class or whether plaintiff would be an adequate class representative. To the extent that the argument is intended to bear on the question whether plaintiff's counsel is qualified or otherwise able to conduct the litigation, we find it to be irrelevant and therefore hold that the first prong of the *Wetzel* test has been satisfied.

We have already considered to some degree whether plaintiff has any interests antagonistic to those of the class. Defendant posits that substantial potential conflicts exist between the interests Ms. Bartelson will seek to further and those of other putative class members.[13] The problem with defendant's position is that it fails to allege with any degree of specificity just what the antagonisms consist of. The argument apparently assumes that there is an "inherent" conflict in a registered account executive's representation of an account executive trainee, for example, or in a salaried employee's representation of an employee paid on an hourly basis. To preclude class certification the alleged conflict must go to the very heart of the subject matter of the litigation. 7 Wright and Miller, *supra*, § 1768 at 639. The bare assertion that such conflicts necessarily exist or might arise does not provide a sufficient legal basis on which to deny class certification. *Hannigan v. Aydin Corp., supra,* 76 F.R.D. at 510;

*Chevalier v. Baird Savings Association,* 72 F.R.D. 140, 145 (E.D.Pa.1976).

As noted above, since Ms. Bartelson does not seek reinstatement, she is not and will not be competing with class members for positions that might become available should the lawsuit terminate with a ruling in her favor. *See Scott, supra,* 601 F.2d at 86 n. 21. Furthermore, thus far in the litigation, Ms. Bartelson has raised no claims and taken no positions that appear on any level to be inconsistent with or antithetical to claims raised on behalf of the class.

Since defendant's list of antagonisms is purely hypothetical and has no basis in the record, and since by virtue of Fed.R.Civ.P. 23(c)(1) we are given the flexibility to alter or amend our initial decision on class certification before determination on the merits, we believe the prudent course is to certify a broad class of female employees and job applicants, subject to later modification should actual conflicts arise.

We address briefly one final point raised by the defendant with respect to plaintiff's ability to represent the class—that plaintiff would be an inadequate representative because she has failed to demonstrate her ability to finance this lawsuit.[14]

At her deposition, Ms. Bartelson was advised by her attorney not to answer questions concerning her net worth, available funds, sources of income, or her relationship with her attorneys. Instead counsel gave defense counsel a copy of an agreement between his firm and plaintiff, which provides that counsel will advance the costs of the lawsuit subject to plaintiff's ultimate liability for reimbursement. Relying on *Sayre v. Abraham Lincoln Savings and Loan Association,* 65 F.R.D. 379 (E.D.Pa. 1974), counsel thus sought to limit defend-

---

**13.** Since we have determined that plaintiff's claims are not typical of the claims of blacks and other minority groups, we need not consider defendant's hypothesis that an inherent conflict arises whenever claims of discrimination on the basis of sex and race are sought to

be litigated by a single plaintiff in a single action.

**14.** It is worthy of note that neither *Wetzel, supra,* 508 F.2d 239 nor *Scott, supra,* 601 F.2d 76 require such a showing in order to demonstrate one's adequacy as a class representative.

ant's questions to those that would explore plaintiff's understanding of her ultimate liability for these expenses.

In *Sayre,* Judge Newcomer held that information concerning a plaintiff's financial status was irrelevant to a determination of adequacy as a class representative and therefore not discoverable where counsel had agreed to advance litigation expenses subject to reimbursement, for "to deny a class whenever plaintiff's counsel advances significant funds to plaintiffs of little or modest means would be to defeat the very purposes which class actions were designed to achieve." *Id.* at 385. A similar solicitude for the plaintiff of modest means was expressed by the Tenth Circuit in *Sanderson v. Winner,* 507 F.2d 477, 479 (10th Cir. 1974), *cert. denied sub nom. Nissan Motor Corp. v. Sanderson,* 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975), where the court held it was error for the district court to have ordered the plaintiffs to produce financial data for purposes of a Rule 23(a)(4) inquiry. ("Ordinarily courts do not inquire into the financial responsibility of litigants. We generally eschew the question whether litigants are rich or poor. Instead we address ourselves to the merits of the litigation.")

■ Although recognizing that the wealth of litigants should be irrelevant to a determination of legal rights, the court in *Rode v. Emery Air Freight Corp.,* 76 F.R.D. 229 (W.D.Pa.1977) nevertheless held that information concerning a plaintiff's financial status was discoverable as relevant to a Rule 23(a)(4) determination. The court's rationale for so holding was the fear that should an indigent plaintiff be named as class representative, any award of attorney's fees to defendants under 706(k) of Title VII, 42 U.S.C. 2000e–5(k) would be rendered meaningless, "while at the same time such a representative in no way prejudices either plaintiff's case or his attorney's potential fee recovery." *Id.* at 230. Indigent nominal plaintiffs, the argument goes,

could bring frivolous lawsuits in the hope of blackmailing the defendant into a settlement.[15]

■ We think the result feared in *Rode* is unlikely to occur with great frequency. Few attorneys will be willing to advance the costs of litigation to an impecunious plaintiff if they believe the lawsuit is brought in bad faith, since upon termination of the case, they, like defense counsel will be unable to recoup whatever moneys they have advanced. Furthermore the strictures of Rule 11, discussed *supra* at 673, discourage the filing of frivolous lawsuits. Finally, we think that where a plaintiff's attorney has agreed to advance the cost of the litigation, to permit the plaintiff's financial status to preclude class representation because of the remote possibility that bad faith will be found and defendant thus deprived of attorney's fees would be to limit the class action device to wealthy litigants, a result antithetical to the purposes of both Title VII and Rule 23. As we have noted elsewhere in this opinion, should events occur during the pendency of this lawsuit to indicate that plaintiff is in any way an inadequate class representative, it remains open to us to narrow the class or decertify it altogether, and if plaintiff fails to meet expenses, we can protect the class members through appropriate action. But, we believe that any such action at this point would be premature and thus decline to follow *Rode.*

### D. *Numerosity*

■ Having determined that plaintiff may represent a nationwide class of female employees and applicants of Dean Witter, we must determine whether the class we have defined is sufficiently numerous to make joinder impracticable. Rule 23(a)(1). The EEO–1 reports filed by the defendant in the years 1974, 1975, and 1976 reveal that female employees numbered in each year in

---

**15.** Fear of encouraging bad faith litigation does not really address the adequacy of representation question, which is concerned with plain-

tiff's ability to protect the interests of the class rather than defendants and their attorneys.

excess of 1300.[16] The number of applicants who during the class period may have been refused employment because of sexually discriminatory policies is, of course, at this point unknown. Though we have excluded from the class those females who for reasons other than the alleged sexually discriminatory policies of defendant did not hold or seek to hold professional, sales, or managerial level positions, we nevertheless find the class to be so numerous as to satisfy the Rule 23 prerequisite. "Where the exact size of the class is unknown, but it is common knowledge or common sense that it is large, courts in Title VII cases have taken judicial notice of this fact and assumed that joinder is impractical." 4 *Newberg on Class Actions*, § 7979 at 1289. We think it clear that the class we have defined fulfills the numerosity requirement. *See Hannigan, supra*, 76 F.R.D. at 510 (class in excess of 75 employees sufficiently numerous to make joinder impracticable).

### III. *Conclusion*

For the foregoing reasons we have determined that plaintiff's motion for class certification will be granted, the class to consist of all present and future female employees and job applicants who were employed by or applied for work with Dean Witter Reynolds on or after a date 300 days before December 10, 1976, excluding those female employees and applicants, who, for reasons other than discriminatory policies based on sex, neither held nor sought to hold positions in the job categories of officials and managers, professionals, or sales workers.

---

16. "[B]y negative implication, [*Wetzel*] can be read in support of the position that future class members are not to be counted or relied upon for purposes of complying with the numerosity requirement of subdivision (a)(1)." *Scott, supra*, 601 F.2d at 88 n. 25.